```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )   Docket No. 20 CR 316-1
 4                  Plaintiff,        )
                                      )   Chicago, Illinois
 5        v.                          )   May 24, 2022
                                      )   11:03 a.m.
 6   CHRISTIAN REA,                   )
                                      )
 7                  Defendant.        )

 8            TRANSCRIPT OF PROCEEDINGS - Sentencing
              BEFORE THE HONORABLE THOMAS M. DURKIN
 9

10   APPEARANCES:

11   For the Government:    MR. BARRY JONAS
                            Assistant U.S. Attorney
12                          219 South Dearborn Street, 5th Floor
                            Chicago, Illinois 60604
13

14   For the Defendant:    MR. TIMOTHY R. ROELLIG
                            Novelle & Roellig LLC
15                          47 West Polk Street, Suite M11
                            Chicago, Illinois 60605
16

17   Also present:         MS. DANIELLE STERN (U.S. Probation)

18

19

20

21

22   Court Reporter:       ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                            Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 1432
24                          Chicago, Illinois 60604
                            312.408.7782
25                          Elia_Carrion@ilnd.uscourts.gov
```

1      (Proceedings heard in open court.)

2            THE CLERK:  This is Case No. 20 CR 316, United States

3      v. Christian Rea.

4            Could I please have the attorney present on behalf of

5      the United States state their name.

6            MR. JONAS:  Good morning, Your Honor.  It's

7      Barry Jones for the United States.

8            THE CLERK:  And on behalf of Mr. Rea.

9            MR. ROELLIG:  Good morning, Your Honor.  Tim Roellig

10     on behalf of Christian Rea, who is present.

11           THE COURT:  And on behalf of --

12           PROBATION OFFICER:  Good morning, Your Honor.

13     Danielle Stern on behalf of probation.

14           THE COURT:  All right.  Good morning, everyone.

15     We're here for sentencing.  Are the parties ready to proceed?

16           MR. JONAS:  Yes, Judge.

17           MR. ROELLIG:  Yes, Your Honor.

18           THE COURT:  Okay.  I have the following documents.  I

19     want to make sure I have everything I should have.

20           I have a presentence investigation report, which has

21     attached to it a number of exhibits, including videos of the

22     incident, which I've already viewed, but it also has a number

23     of interviews of the victims of this case, who are Naperville

24     police officers.  I have FBI 302s of Mr. Rea; I have a

25     defendant's sentencing memorandum; I have a Naperville Police

1  report on the whole incident, a multipage report detailing the

2  entire incident; I have a government's sentencing memorandum,

3  which I have -- and I also have letters from family members

4  and friends and the defendant -- of the defendant, and a

5  letter from the defendant himself; I have a recommendation of

6  the probation office; I have a series of pretrial services

7  reports relating to the repeated cocaine use by Mr. Rea while

8  on pretrial release, which I will consider at sentencing; and

9  I also have something I received this morning, which was the

10 police report relating to Mr. Rea throwing a brick through the

11 Naperville library windows on the same night the explosive

12 device was used.

13       And that's everything I have, other than I did pull

14 up the government's sentencing memo, and the response to the

15 defendant in the Jacob Fagundo case, 21 CR 195, which is

16 referred to in one of the sentencing submissions of the

17 government where they are recommending that three points

18 for -- under § 2A2.4(b)(1) not be imposed.  So I did pull up

19 the government's sentencing memorandum and the response on

20 that.

21       Anything else I should have?  First, the government?

22       MR. JONAS:  I just want to make sure you've got the

23 restitution form, the victim restitution form.  That should

24 have been with the government version.

25       THE COURT:  It -- let me check.  Not your memo, but

1    the government version that's attached to the PSR?

2            MR. JONAS:  Correct, Judge.

3            THE COURT:  Okay.  Let me look.

4            MR. JONAS:  It would have been one of the last pages.

5            THE COURT:  Okay.  Yes, I do.  It's the $13,585.66?

6            MR. JONAS:  Correct.

7            THE COURT:  I do have the -- that as an attachment to

8    the government's version.

9            MR. JONAS:  Thank you, Judge.

10           THE COURT:  Anything else?

11           MR. JONAS:  No, Judge.

12           THE COURT:  Anything else from defense?

13           MR. ROELLIG:  You have everything, Your Honor.

14           THE COURT:  All right.  And probation aware of

15   anything else I should have?

16           PROBATION OFFICER:  No, Your Honor.  Thank you.

17           THE COURT:  Oh, okay.  All right.

18           All right.  Does either side anticipate calling any

19   witnesses or victims for this hearing?  First, the government?

20           MR. JONAS:  No, Judge.  I asked the police officers

21   if they wished to make a victim statement and they declined.

22           THE COURT:  All right.  And defense?

23           MR. ROELLIG:  None, Your Honor.

24           THE COURT:  Okay.  All right.  Mr. Roellig, have you

25   and your client read and discussed the presentence report and

1  the objections to it and the recommendation of the probation

2  office?

3          MR. ROELLIG:  Yes, Your Honor.

4          THE COURT:  All right.  Mr. Rea, have you read and

5  discussed the presentence report and the recommendation of the

6  probation office and the objections to any of the

7  recommendations?

8          THE DEFENDANT:  Um, yes.

9          THE COURT:  Okay.  All right.

10         So what are the objections to the presentence report?

11  I'll ask first, the government?

12         MR. JONAS:  Judge, the only objection we have is the

13  imposition of the three-level increase in 2A2.4(b)(1)(B),

14  which states:  "The dangerous weapon, including a firearm, was

15  possessed and its use was threatened."

16         We're not disputing -- I mean, I think we agree that

17  the firework, explosive device was a dangerous weapon.  It --

18  it -- it harmed police officers.  I think the issue here, and

19  this is an incredibly close case, is whether it was threatened

20  warranting three-level increase.

21         And I recognize the government in the fan -- Fagundo

22  case, if I'm pronouncing that correctly, imposed the three

23  levels without any argument or disagreement from defense

24  counsel.  I do think, as I laid out in the sentencing

25  memorandum, there is a distinction between that case and this

1   case, as well as other cases that I cited.  I think *Milliron*,

2   may be the other case I cited in the sentencing --

3        THE COURT:  *Milliron* didn't deal with the issue we're

4   talking about.  That really dealt in the end, I thought, as I

5   read it, with the issue of whether it was a dangerous device.

6   I don't think it dealt with what constitutes a threat.

7        MR. JONAS:  And -- and -- and I think it's correct,

8   Judge.  And I found one other case where it even just talked

9   about what a threat was, and in that case it involved agents

10  boarding a boat down in Florida that had immigrants trying

11  to -- illegal immigrants trying to get onto the shores of the

12  United States, and the immigrants threatened by pulling out a

13  knife against the agents.  They threatened to harm themselves

14  and harm the agents.  So there's an actual threat.

15       And I -- I think this case just happened so quickly,

16  where my understanding, what I saw in the video, when we

17  talked to the witnesses was someone handed the defendant the

18  device, it was lit, and it was thrown.

19       THE COURT:  Let me stop you right there.

20       MR. JONAS:  Yes.

21       THE COURT:  It was lit, but it was lit by the

22  defendant.  And as 302 indicates, he asked someone else for a

23  lighter so he could light it.  I had thought reading the --

24  until I got the 302s, this was just picking up something off

25  the ground, like a rock, and throwing it.  He picked up a

1    device off the ground, he asked someone for a lighter to light

2    it, he lit it, and then he threw it at the police.  So the --

3    it doesn't go to the threat issue, but the issue of

4    premeditation, although slight, exists here.

5         MR. JONAS:  I understand, Judge.  And I want to focus

6    on the threat issue.

7         THE COURT:  Okay.

8         MR. JONAS:  And it's hard to define what a threat is

9    because he didn't hold it, look at the police, let them see

10   it, and indicate to them that he was going to throw it.  And

11   that's why when I said it happened so fast, I meant in that

12   respect.

13        This is a very close call, and I think that the

14   government has decided to err on the side of caution in this

15   case and not seek the imposition at three levels because it's

16   hard to say there was an actual threat made.

17        THE COURT:  What do you make of the probation

18   officer's argument that the use occurred so that it's beyond a

19   threat; it's the actual physical use of it?

20        MR. JONAS:  I -- I -- I spoke to probation office

21   about that, and I understand their argument, it's that the

22   threat is subsumed within the use.  Honestly, I think that

23   if -- if -- if the Sentencing Commission intended the threat

24   to be subsumed within the use, I think the language of the --

25   of the guideline would be different.  I think it would include

1   threatened and/or used.  But it doesn't.  It just says the

2   word "threatened."  So I think because it was -- it's limiting

3   to just that word and that action and -- and we don't really

4   see that action here, at least not in my view, we want to be

5   more cautious in this situation.

6          THE COURT:  It's an odd circumstance where a threat,

7   where if he just held it up and said, Look here what I've got

8   would get him three points; and yet, lifting it up and

9   throwing it doesn't get him the three points.  It's --

10         MR. JONAS:  I -- I --

11         THE COURT:  -- it's perverse.

12         MR. JONAS:  I don't disagree, Judge.  It is weird.

13  I'm not sure I can respond to that.  And I'm on the Sentencing

14  Commission.

15         THE COURT:  All right.  Mr. Roellig, looks like

16  Mr. Jonas is making the arguments for you.

17         MR. ROELLIG:  And I appreciate it.

18         THE COURT:  Pull the mic closer.  Thank you.

19         MR. ROELLIG:  Sorry.

20         Judge, I will say, too, in my conversations with

21  Mr. Jonas, I brought up the same issue.  That is, it seems

22  incongruent in the guideline to -- to make harm not as serious

23  of an issue as threat, rather than how the guideline is

24  written.  But it is written the way it's written, and they

25  could've clearly put the word even harm in there and then it

1    would have been what the probation department thought it was,

2    but it's not there.  And I think just the -- languagewise,

3    the -- at least for the purposes of the application of the

4    guidelines, Your Honor can take into account many more factors

5    and things, obviously, at the sentencing -- or at the -- under

6    the 3553(a) factors.

7           But I think for properly calculating the guidelines,

8    I agree with the government, and I also think the language of

9    the guideline itself won't support finding it under these

10   facts.

11          THE COURT:  Any view by probation?

12          PROBATION OFFICER:  No, Your Honor.

13          THE COURT:  Okay.  Well, I'm -- I've expressed my

14   confusion and frustration over this, but I'm going to not

15   apply the three-level enhancement because I don't think it

16   meets the straight language of the guidelines.

17          I will, quite candidly, and as you suggested,

18   Mr. Roellig, I have the ability to do, it's a matter in

19   aggravation.  I mean, this -- it's truly a matter in

20   aggravation, the fact that he threw it rather than threatened

21   it.  The fact that he could have a higher guideline range if

22   he just held it up and threatened its use, as opposed to

23   actually throwing it and using it, is something I will

24   consider in aggravation.

25          Another point I'm going to consider in aggravation,

1   but it's not a contested guideline point, is that there's an

2   increase in two levels for a victim sustaining bodily injury.

3   Here, there were multiple victims.  So another matter in

4   aggravation that I'll deal with later when I -- when I hear

5   your arguments as to aggravation and mitigation.

6           So with that, then, the base offense level is 10.

7   And there's 2 points added because of an injury to a victim.

8   That gets us to 12.  Two points off for acceptance of

9   responsibility.  Gets us down to 10.

10          Am I correct on my guideline calculations?

11          PROBATION OFFICER:  That's correct, Your Honor.

12          THE COURT:  Okay.  And with a criminal history

13  category of 1, that gives us a guideline range of 6 to

14  12 months.

15          Does the government agree with that calculation?

16          MR. JONAS:  Yes, Judge.

17          THE COURT:  And I think your sentencing memo has it a

18  couple different ways.  You have -- at pages 12 and 18, you

19  have it at a higher -- I'm sorry -- page 1 and page 7 -- I

20  apologize -- page 1 and page 7, you have it at 12 to 18.  And

21  then at page 4, you have it 6 to 12.

22          I assume you're -- and I know that's a typo, but I

23  assume 6 to 12 is what you're advocating?

24          MR. JONAS:  Yes, Judge.  I apologize for the typo.

25          I also noticed -- Mr. Roellig pointed out in the

 1  caption, in caption 4, it says 71 months.  Again, a typo.

 2          THE COURT:  Yeah, that's fine.  I understood the

 3  intent, and I was not confused, but I just want to be clear

 4  that you're clear that that's what it is.

 5          So that would result in a guideline range of 6 to

 6  12 months.

 7          Does defense agree with those calculations?

 8          MR. ROELLIG:  Yes, Judge.

 9          THE COURT:  All right.  Are there any other

10  objections to the presentence report beyond that issue

11  relating to the guideline calculation?

12          MR. JONAS:  Not from the government, Judge.

13          MR. ROELLIG:  No, Judge.

14          THE COURT:  All right.  I'll adopt the presentence

15  report without objection, with the exception of the objection

16  we just spoke about as to the three-point enhancement and

17  otherwise, I will adopt the presentence report.

18          Next thing I need to do is calculate the guideline

19  provisions.  As we just said, the guideline, it's a total

20  offense level of 10, criminal history category of I, resulting

21  in a guideline range of 6 to 12 months, period of supervised

22  release I believe is still 1 to 3 years; fine is $5,500 to

23  $55,000, amount of --

24          PROBATION OFFICER:  I'm sorry.  The fine range --

25          COURT REPORTER:  Speak into the mic, please.

1   THE COURT:  Oh, yeah.  I'm sorry.

2   PROBATION OFFICER:  Sorry; it's all the way over

3 there.

4   THE COURT:  Okay.

5   PROBATION OFFICER:  The fine range has changed.

6   THE COURT:  Yes.

7   PROBATION OFFICER:  It's now 4,000 to 40,000.

8   THE COURT:  Thank you for that.

9   Okay.  So that'll be 4,000 to 40,000 is the guideline

10 range for the fine restitution, restitution is $13,585.66, and

11 there's a $100 special assessment.

12   Does the government agree with those guideline

13 calculations?

14   MR. JONAS:  Yes, Judge.

15   THE COURT:  Does defense agree?

16   MR. ROELLIG:  Yes, Judge.

17   THE COURT:  Okay.  Those will be the guideline ranges

18 for this case.

19   Are there any formal departure motions the government

20 is wishing to make at this time?

21   MR. JONAS:  No, Judge.

22   THE COURT:  Any the defense wishes to make, keeping

23 in mind that I will consider any grounds that previously would

24 be a ground for departure, I'll consider it in determining a

25 reasonable sentence under 18 U.S.C. § 3553(a).

1          MR. ROELLIG:  We have none, Your Honor.

2          THE COURT:  All right.  So after calculating the

3    guidelines, finding no departure's appropriate, I must now

4    consider the relevant factors set out by Congress at

5    18 U.S.C. 3553(a) and ensure that I impose a sentence

6    sufficient, but not greater than necessary, to comply with the

7    purposes of sentencing.  These purposes include the need for

8    the sentence to reflect the seriousness of the crime, to

9    promote respect for the law, and to provide just punishment

10   for the offense.  The sentence should also deter criminal

11   conduct, protect the public from future crime by the

12   defendant, and promote rehabilitation.

13          In addition to the guideline and policy statements, I

14   must consider the nature and circumstances of the offense, the

15   history and characteristics of the defendant, the need to

16   avoid unwarranted sentence disparities among similarly

17   situated defendants, and the types of sentences available.

18          Does the government wish to argue about the

19   application of the factors set forth in Section 3553(a),

20   request a variance, or otherwise make a sentencing

21   recommendation?

22          MR. JONAS:  Yes, Judge, briefly.

23          THE COURT:  I have a couple of questions for you

24   before you start.

25          It appears other people were throwing fireworks, too.

1    Could you tell?

2         MR. JONAS:  At that -- at that moment or within the

3    evening?

4         THE COURT:  In the evening.

5         MR. JONAS:  Yes, Judge, during the evening,

6    absolutely.  In fact, I prosecuted another individual for

7    doing with a firework a different offense.

8         THE COURT:  In Naperville?

9         MR. JONAS:  Yes.

10         THE COURT:  Pull the mic closer, please.

11         MR. JONAS:  Oh, sorry, Judge.  Yes, Judge.

12         THE COURT:  And what was -- tell me about that case;

13    who was it in front of; and what was the sentence.

14         MR. JONAS:  Sure, Judge.  So that was *United States*

15    *v. Diego Vargas*, V-A-R-G-A-S.  That was before Judge Bucklo.

16    We did not charge the same offense.  In that instance, we

17    charged the explosive expense -- violation of explosive

18    statute.  And, Judge, I apologize, I'm drawing a blank on what

19    the statute is off the top of my head.  It carried a 5-year

20    mandatory minimum.

21         What happened in that case was the defendant took a

22    street pole and broke the window of the Egg Harbor Restaurant

23    and then lit the same firework and threw it through the

24    restaurant window, and then there was the double explosion, as

25    we saw here.  No one was in the restaurant, so there was

1   no one injured.  There was some minimal damage to the

2   restaurant.

3            Mr. Vargas had, throughout that evening, based on

4   videotape, had been somewhat destructive and was committing

5   other offenses as well, including looting of -- I think it was

6   a Pandora store, but it was looting of a jewelry store.  He

7   had also been charged in another indictment for -- the night

8   before in Aurora during their riots of trying to break into an

9   ATM machine along with a crowd.

10           He also was charged in between -- or he was charged

11  for an incident after the Naperville incident with, I think,

12  attacking his girlfriend in a homeless camp.  So he ended up

13  pleading guilty in the explosion -- explosive case before

14  Judge Bucklo.  The Aurora case was rolled into that one as a

15  related offense, and he was sentenced to the mandatory minimum

16  of five years.

17           THE COURT:  What was the hacking?  I didn't quite

18  understand you.

19           MR. JONAS:  I'm sorry, the?

20           THE COURT:  Something about hacking with a

21  girlfriend?  Or what was the --

22           MR. JONAS:  Oh.  So after these two incidents, the

23  one in Aurora and then the one in Naperville, he attacked his

24  girlfriend.  They were living in a homeless camp --

25           THE COURT:  I see.

1          MR. JONAS: -- and they got into a physical

2 altercation with her.

3          THE COURT: Okay. I misheard you. All right. So he

4 got the five-year mandatory minimum which was required by the

5 charge that he pled to?

6          MR. JONAS: Correct.

7          THE COURT: Okay. All right. Were any other people

8 prosecuted based on the Naperville incidents?

9          MR. JONAS: Not that I'm aware of. Not -- not

10 federally, that I'm aware of.

11          THE COURT: Okay. And what is the status of the case

12 with the brick thrown through the library window, Mr. Roellig,

13 if you know?

14          MR. ROELLIG: Yes, Judge. That is -- we are up for

15 status on our next court date waiting for the outcome of this

16 case. The -- we have not entered into negotiations at this

17 point. The -- I'm sure that at some point we may end up doing

18 a 402 conference, but I -- we're just not there because this

19 case is sort of the driver, as -- as you can imagine, of

20 disposition in that case.

21          THE COURT: All right. And I -- in reading through

22 the 302s and the investigative reports, it looks like the

23 government was looking pretty aggressively to see who brought

24 the backpack full of these explosives.

25          Did you ever find out who brought them?

1           MR. JONAS:  No, Judge, we never did.

2           THE COURT:  Okay.  All right.  You may proceed.

3           MR. JONAS:  Thank you, Judge.

4           As you know, having watched the video, this is a

5  very, very fast incident where the defendant took the

6  explosive device from someone else who picked it up off the

7  ground, someone said lit it, he lit it, or had it lit, and

8  then threw it.

9           And as a mitigating factor, we've came across no

10  evidence that the defendant went down to downtown Naperville

11  that evening with the intention of committing any violence or

12  civil disobedience or had the firework in his possession.  So

13  I attribute this to, frankly, a stupid act done by an

14  18-year-old kid.

15          However, as an aggravation factor --

16          THE COURT:  And let me interrupt you.

17          MR. JONAS:  Yeah.

18          THE COURT:  I think Judge Kennelly just said in

19  response to another incident of civil unrest in Chicago:  "If

20  stupidity were a defense to crimes, there would be nobody in

21  jail."  Go ahead.

22          MR. JONAS:  I had a former colleague who used to say,

23  "We only catch the stupid ones."

24          But I -- I -- you know, I'm trying -- I'm trying to

25  put this in context from the way I see it.  But one -- but as

1   an aggravating factor, I think is a significant aggravating

2   factor, something that the defendant made a conscious effort

3   to do was throw it at police officers.  Throwing it at anybody

4   is bad.  Clearly, this is a dangerous weapon.

5           And, Judge, just to give you some understanding of

6   what this firework is designed to do, from my understanding is

7   it's supposed to go into a tube, be lit, shot up into the air,

8   and then explode, which is why there were two explosions in

9   the video.  The first one is the one to propel it into the

10  air.  So it's a smaller explosion.  And then the bigger one is

11  the one that everyone goes to see.  And -- and that bigger

12  one, as you saw in the video, was pretty big, in my -- my

13  view, a very bright, loud, and is the one that caused the

14  injuries.

15          Aiming it at anybody is dangerous.  And even an

16  18-year-old should know that that is just a wrong thing to do

17  that's going to cause harm.  Aiming it at police officers,

18  especially in that situation where they're lined up there to

19  protect the public during a time when there had been a lot of

20  civil unrest, people were peacefully protesting, which is, you

21  know, absolutely their right, but these protests, as we saw,

22  turned violent in some instances.

23          So they're there to protect the public, to protect

24  the property, to protect the peace.  To throw it at them is an

25  additional aggravating factor, in addition to just throwing it

1    at a person.

2          As a result, as Your Honor saw on the video, not only

3    did it cause injuries, but it caused some panic among the

4    crowd; people started running.  And -- and -- and that could

5    have and may have been the thing that -- that sort of set off

6    the tinderbox.  Tensions were high, things were not exactly

7    peaceful at the moment, but it got worse during the evening,

8    maybe as a result of what happened here.

9          So you then -- focusing on the injuries of the

10   officers, I didn't put it in the sentencing memo what they

11   were injured 'cause I was trying to protect their medical

12   privacy.  But you saw, Judge, in the government version, there

13   were I believe five officers that were injured from migraine

14   headaches that continued for months afterwards, ringing of the

15   ears, which still continues in two officers today; the

16   tinnitus, some vision loss for some of the officers.  These

17   are not insignificant injuries that go away overnight.  These

18   really cost -- are -- are health factors that impact their

19   lives.  And I think, Judge, you need to consider that as an

20   aggravating factor here.

21         In addition to the -- the cost to Naperville, the --

22   the medical costs of the $13,000 isn't high.  I imagine -- as

23   high as I thought it would have been.  I imagine partly

24   because of probably some insurance that the City has, but it's

25   no small amount either.  And -- and I think that that speaks

1   volumes as to the -- the damage caused by the defendant and

2   his conduct.

3         So I think, Judge, looking at the 3553(a) factors,

4   the fact that he threw it at law enforcement officers shows

5   that the sentence should reflect a need to instill respect for

6   the law.  I think this -- one of the factors is the

7   seriousness of the offense.  And the fact that officers were

8   injured here makes this a very, very serious offense.

9         Deterrence, I'm not sure how much personal deterrence

10  is needed here, but certainly general deterrence.  If there is

11  such disobedience in the future, people know -- need to know

12  if they're gonna injure officers, if they're gonna break the

13  law, that -- that there's going to be a price to pay for that.

14        So I think with -- with all those factors, coupled

15  with the guidelines here, I think a guideline sentence is

16  warranted.

17        THE COURT:  Mr. Jonas, I also am sensitive to

18  protecting the personal medical information of the officers,

19  but there's a 302 relating to -- at page 29 of 134 on

20  Document 60.

21        MR. JONAS:  I'm sorry, Judge, you lost me on that.

22  302 --

23        THE COURT:  That's Document 60, which is the PSR.

24        MR. ROELLIG:  Okay.

25        THE COURT:  And then I'll wait until you get to the

1  PSR.

2          MR. JONAS:  You mean the government version?

3          THE COURT:  No, the whole PSR, which has a number of

4  attachments to it.

5          MR. JONAS:  I'm sorry, Judge.  Can you give me the

6  page again?

7          THE COURT:  Page 29 of 134.

8          MR. ROELLIG:  Judge, unfortunately, my copy doesn't

9  have those page numbers.

10         THE COURT:  I see.

11         MR. ROELLIG:  And I don't want you to necessarily say

12  anybody's name, but can you give me some --

13         THE COURT:  Yeah.

14         MR. ROELLIG:  -- and I'll find it.

15         THE COURT:  It's a Naperville detective with the

16  initials AC.

17         MR. JONAS:  Judge, I think that's where part of the

18  confusion is because --

19         MR. ROELLIG:  Yes, I have that one.

20         MR. JONAS:  -- we have -- we have it as attached to

21  the PSR --

22         THE COURT:  I see.

23         MR. JONAS:  -- but not those page numbers.

24         THE COURT:  Sure.  So it's Detective AC.

25         MR. JONAS:  I got it, Judge.  I have the 302 here.

1      THE COURT:  All right.  And this states that AC was

2  told he had some very serious hearing issues, that he has the

3  hearing of a 70-year-old.

4      How old is AC?  It's blanked out, of course, on my

5  version.  I don't know if you interviewed him.  I don't know

6  if you have any estimate as to his age.  If you don't, you

7  don't --

8      MR. JONAS:  Right.

9      THE COURT:  -- but I suspect he's not 70 years old.

10      MR. JONAS:  No, he's not 70 years old.  I've had

11  email communications with him multiple times, including as

12  recently as May 9th.  Unfortunately, the version I have

13  brought is also blacked out, so I don't have his age.  My

14  recollection is these officers were in their 30s and 40s,

15  generally speaking.

16      And just so you know, Judge, when I emailed him

17  recently, I asked for updates, he had said that him and the

18  officer whose last name starts with an S have constant ringing

19  in both ears that have not stopped since the incident; that

20  there's no cure or treatment available.

21      So that officer that you're referring to still has

22  the tinnitus.

23      THE COURT:  Okay.  All right.  Very good.  Anything

24  else from the government?

25      MR. JONAS:  No, Judge.

1          THE COURT:  Okay.  All right.  Does defense wish to

2     argue about the application of the factors set forth in

3     Section 3553(a), request a variance, or otherwise make a

4     sentencing recommendation?

5          MR. ROELLIG:  Yes, Your Honor.

6          THE COURT:  All right.  Proceed.

7          MR. ROELLIG:  Judge, as far as the seriousness of the

8     offense, there's no doubt that this is a serious offense.  It

9     is a serious offense in the sense that throwing a device such

10    as this toward a group of police officers is dangerous without

11    the physical harm.  It's then, of course, with the physical

12    harm, it's aggravated.  There is no -- no way around that.

13    That is a fact.  And Your Honor will take that into account.

14         I do think that his decision-making process here, and

15    I heard Your Honor's comment about the premeditation early on,

16    but I do think that his decision-making process here was at

17    least influenced by the course of events, that he was both

18    participating in and witnessing that night.  It is an

19    unfortunate thing for Mr. Rea and for the officers involved,

20    that he was not able to overcome that influence and use his

21    better judgment in that situation because, obviously, he did

22    not when he made the decision to throw it.  So there --

23    it's -- that is clear that that is a serious matter.

24         I think that you can see, Judge, by portions of the

25    PSR, regarding the history and characteristics of the

1    defendant, that he has some -- because of his age, most

2    likely -- he was 18 at the time.  I said 20.  That was a

3    mistake that I made in the memorandum on page -- on my page 4

4    of my memorandum.  He was 18 at -- at the time.  Given his

5    examination at Northwestern regarding his neurological

6    functioning, he's likely at that point in his life, and even

7    today, he's not quite 21, his brain and executive functioning

8    is still developing and that -- I'm sure that that in some

9    ways contributed to his inability to use judgment necessary to

10   stop from -- himself from doing.

11              THE COURT:  Can I interrupt you for one second?  His

12   birthday is November 15, 2000.  This occurred June 1, 2020.

13   Wouldn't he be 19 then?

14              MR. ROELLIG:  That's -- I'm sorry, Judge.  19.

15              THE COURT:  All right.  Go ahead.

16              MR. ROELLIG:  I don't think it material -- materially

17   changes the points I just made, but I --

18              THE COURT:  No, but I wanted to be accurate

19   because --

20              MR. ROELLIG:  So --

21              THE COURT:  -- it should be accurate.

22              MR. ROELLIG:  -- I believe, Judge, that that -- and,

23   of course, Your Honor is going to consider his problems on

24   pretrial release here.  There was a significant amount of time

25   when he had no difficulties on pretrial release.  And then as

1   we approached a guilty plea in this case, his problems seemed

2   to have cropped up.  And I think it had to do with the stress

3   and his inability to deal with that.

4       I will say, Judge, that I spoke to Mr. Wheatley, his

5   pretrial person.  He has had -- his last positive test was in

6   December.  And he's had 15 negative drug tests since then.  So

7   I think Your Honor handled it judiciously, no question about

8   it, in giving him home confinement, but he also was at least

9   able to correct that behavior.

10      He goes to weekly group counseling through a family

11  counseling center in Aurora.  He goes to individual counseling

12  once a month, and has reported back to Mr. Wheatley that he

13  believes that that has been a critical factor in fixing that

14  issue for him.

15      Judge, I think that this is -- was, there's no

16  question on his part, an impulsive decision.  The

17  circumstances allowed him to make a terrible decision.  I

18  think that he -- you know, the mitigating factor is that he

19  did not, as the government points out, he did not plan it, he

20  did not bring it.  He was not someone who was an

21  antigovernment operator or -- or someone who was agitating

22  prior to this.

23      The government did a thorough investigation of all --

24  all those sorts of parts of these cases, and nothing like that

25  shows up with this defendant.  If he had stayed home that

1  night, this -- you'd have never heard of him.  I am sure of

2  that, as far as this kind of activity, but -- but he didn't,

3  clearly.

4         Judge, I think that he is a young man who is going to

5  learn his lesson.  I understand the general deterrence

6  considerations that Your Honor has to take into account, and

7  Your Honor will.  And -- but I agree with the government that

8  specific deterrence here, I think this will be your last time

9  you see Mr. Rea involved in any activities such as this.

10        I know that he feels deeply ashamed for his conduct

11 in this case and the harm that it caused.  You can see that he

12 has -- his family is here in court.  His family has supported

13 him throughout this process.  They will continue to support

14 him.  He has a potential job lined up for himself, because

15 he's obviously going to have some restitution that needs to be

16 paid in this case.

17        And before I forget, Judge, we're also asking if

18 Your Honor will impose restitution, but I would ask it to be a

19 condition of either his MSR time, if that's what Your Honor

20 determines, or probation, and not due and payable immediately

21 because he needs time to make the money to pay the

22 restitution.  So we would ask that that be reflected in any

23 sentencing order that you have.

24        Judge, I -- I don't want to repeat everything that

25 I've said in the sentencing memorandum.  We would just ask

1    Your Honor to consider and impose a reasonable sentence based

2    on the factors that we've identified, both today and in the

3    memo.

4         THE COURT:  All right.  Does either side know whether

5    the brick through the library window occurred before or after

6    the explosion -- explosive device was thrown?

7         MR. JONAS:  My recollection, Judge, is that it

8    occurred after, but I -- I can't say that with certainty.  I

9    haven't looked at the timing in a long time.

10        THE COURT:  Do you know, Mr. Roellig?

11        MR. ROELLIG:  I have looked at the timing, Judge.  It

12   was after.

13        THE COURT:  All right.  Okay.  Mr. Rea, you have an

14   opportunity to make a statement to the Court to present any

15   information to me to mitigate your sentence.  I won't penalize

16   you if you don't make a statement, but this is your

17   opportunity to talk to me if you want to.

18        Do you wish to make a statement?

19        THE DEFENDANT:  Yes.

20        THE COURT:  All right.  Go ahead.  Take your time.

21   Make sure you're speaking into the microphone.

22        THE DEFENDANT:  Okay.  Hey, Your Honor.  I ask for

23   apology from you, forgiveness from the officers that I harmed.

24   I intentionally didn't mean to do that that day.  I have --

25   I'm sorry for harming them and I'm sorry for the usage of the

1    drugs issue that was going on through the probation time, and

2    I'm just asking for forgiveness from you and the officers as

3    just the -- I mean, I didn't mean to hurt them and it wasn't

4    intentionally to do it that day.

5            THE COURT:  Thank you.

6            Okay.  All right.  First thing I do whenever I impose

7    sentence is go through -- impose the period of supervised

8    release and go through other -- the conditions of supervised

9    release.  I am going to impose a period of three years'

10   supervised release as the initial part of this sentence.  I

11   believe three years is appropriate.  It's recommended by the

12   probation office, and it's necessary because Mr. Rea has shown

13   an inability to abide by the conditions of release.

14           It's great he's, you know, apparently doing well now,

15   but most defendants when they're out facing serious criminal

16   charges don't go out and commit other crimes.  He was

17   possessing and using cocaine on a regular basis and lying to

18   me about it repeatedly when we'd get on the phone, and lying

19   to his pretrial services officer.  So that fully justifies the

20   full three years of supervised release.  In addition,

21   Mr. Rea's immaturity, which is plainly evident, needs to be

22   supervised for the maximum period of time allowed.  So the

23   three-year period of supervised release will be imposed.

24           Now, I can go through each of the conditions of

25   supervised release, which are contained in the presentence

1  report, or you can simply tell me if you object to any of them

2  and waive the reading of them.

3         What's your preference?

4         MR. ROELLIG:  We can waive the -- waive the reading

5  of them, Judge.  We don't object.

6         THE COURT:  All right.  They will all be imposed.  I

7  just want to review them.

8    (Pause in the proceedings.)

9         THE COURT:  And I will also impose the -- I will

10  waive a fine.  There's no ability to pay a fine, but I will

11  impose the restitution of $13,585.66.  I'll waive the interest

12  on that restitution.  And also, there's $100 special

13  assessment.  So those will be the period of supervised release

14  and the conditions of supervised release.

15         The next thing that, of course, is the most important

16  part of any sentencing is whether -- what to do relating to

17  incarceration.

18         Context matters.  This was in the middle of what were

19  originally peaceful protests in downtown Naperville that

20  turned into civil riots; looting and all kinds of mayhem.  And

21  the context I think is necessary to understand what happened.

22         I'm going to refer to the Naperville police report so

23  that everyone understands what the context was when this

24  happened.  It says:  Shortly after 1500 hours, a group of

25  protesters, estimated by officers via transmission, as close

1   to 800 people entered into the roadway at Chicago and

2   Washington to march disrupting vehicular traffic.

3          Naperville Police Department adapted a block traffic

4   for the safety of protestors now on the roadway.  The march

5   repeatedly circled the downtown area and eventually led to the

6   Naperville Police Department where it then returned to

7   downtown at approximately 1700 hours.

8          Many of the protestors dispersed following apparent

9   direction from the organizers, but a crowd still numbered at

10  several hundreds remained and consumed the roadways.  Many of

11  the protesters were evidently provocateurs armed with rocks or

12  sticks wearing masks not designed for COVID protection and

13  advancing a narrative suggestive of inciting the crowd to

14  become violent.

15         This was corroborated by many open social media

16  posts.  Examples included a Twitter entry saying:  "3:00 p.m.

17  in downtown Naperville is about to be," and there's a fire

18  symbol.  Another Twitter reference said:  "If y'all really

19  want to destroy shit, go to Naperville."

20         Another one said:  "If y'all looting, take your ass

21  to Naperville where they deserve it.  LMAO," which means, I

22  believe, laughing my ass off.

23         Then, finally, a Twitter notice that said:  "I live

24  in Naperville, and I approve this message.  There are too many

25  damn racists and Trump supporters in this town."

1       That's the atmosphere.  A curfew was implemented by

2   City of Naperville officers to take effect at 2100 hours,

3   directing all people to vacate the downtown area.  Police

4   transmission -- radio transmission beginning around 1958 hours

5   described protesters being in possession of boards, bottles

6   with wicks, and rocks.  Members of the crowd were observed

7   trying to open doors on closed businesses or pelting rocks

8   into the windows to break the glass.

9       At approximately 2115 hours when the crowd failed to

10  disperse and probative property destruction and looting began,

11  the Naperville Police Department Special Response Team was

12  deployed to the intersection of Washington and Chicago in

13  conjunction with people from Homeland Security.

14      Moving ahead, they said:  At the time of deployment,

15  a large crowd filled the entire intersection, kneeling or

16  standing, chanting "George Floyd" and "I can't breathe" and

17  "hands up, don't shoot."

18      Then at approximately 2135 hours, a sergeant of the

19  Naperville Police Department issued a dispersal order to the

20  crowd using a loud speaker.  The dispersal order was repeated

21  three times and met with several fuck you comments from the

22  crowd, along with purposeful obstinance to vacate.  The

23  chanting continued for a few minutes afterward until a large

24  explosion was heard to the west of our location near Chicago

25  and Main Street which prompted the group to scatter.  The

1    explosion was not police-initiated action.

2        Of course, this is the explosion Mr. Rea caused.

3        There were a series of loud bangs heard at roughly

4    the same time suggested of boards or rocks impacting windows.

5    Additionally, full water bottles were hurled from the crowd

6    toward the officers and formation.

7        At approximately 2139 hours, an unidentified

8    protestor threw an explosive or incendiary device with an

9    evidently lit and sparking fuse from northwest of our position

10   and possibly from in front of Jimmy's Grill.

11       And I misspoke earlier.  This is the device Mr. Rea

12   threw.

13       The device landed on the driver's side of the armored

14   rescue vehicle directly at the feet of the officers on line.

15   There was an initial smaller-scale explosion followed by a

16   plume of smoke, but the device then unleashed a much larger

17   explosion and shower of fire and sparks within seconds.

18       The intense light, extremely loud noise, and

19   percussive effects temporarily stunned the team rendering them

20   vulnerable to attack from the crowd.  The device behaved --

21   this -- the SRT, which is a device that the police used, the

22   Special Response Team, employs a noise flash diversionary

23   device called "NFDD" for tactical operations, and the

24   intensity of the explosion far exceeded the light and decibel

25   level of an NFDD.

1           The device behaves similarly to a commercial grade

2    fireworks mortar, and the heat generated during the explosion

3    caused the asphalt to glow hot.  In addition, the driver's

4    side of the armored rescue vehicle was evidently singed.  Had

5    the device landed inches closer to the officers on line, the

6    explosion would certainly have caused serious bodily harm and

7    possibly death.

8           And I will note as an aside, Mr. Rea, had this gone

9    any closer to the police and someone been -- someone died,

10   you'd be in Stateville right now.  You would have been charged

11   with manslaughter by the DuPage County State's Attorney's

12   Office.  Given the tapes that show and the interviews show

13   that you were the one throwing that, I have no doubt you would

14   have been convicted, and I have no doubt a DuPage judge would

15   have sentenced you to a long period of jail and you'd be

16   sitting in Stateville or Pontiac right now.  It was that

17   close.

18          So that's the context in which this was thrown.  It's

19   not a -- which was extremely serious and put not just the

20   officers in danger, but just the entire situation exploded

21   after that.

22          Now, a few words about the injury, which is also an

23   aggravating factor.  I won't name the officers, to protect

24   their privacy.  But there is an officer, Detective AC, he

25   first noticed a high-pitched ringing in his ears the next

1    morning and went to a doctor for consultation.  The doctor

2    noticed redness in his ears and referred him to an ENT

3    specialist.  AC met with an ENT, who also noticed redness in

4    his ears and prescribed him a steroid pack to help with the

5    ringing and tinnitus.  The steroid pack did not help relieve

6    the tinnitus.

7         The AC visited the ENT on multiple occasions and it

8    was determined that his tinnitus is most likely permanent.  AC

9    was referred to an audiologist for hearing testing and to be

10   fit with hearing aids.  After one of the hearing tests, AC was

11   told he has the hearing of a 70-year-old.  AC stated the

12   ringing and tinnitus has not stopped since the June 1, 2020,

13   incident.  And this is an interview of March 2021.

14        Officer -- Detective BS said he is still experiencing

15   ringing in both of his ears -- and this is an interview of

16   January 2021, six months after the events -- still

17   experiencing ringing in both of his ears.  BS's doctor stated

18   he has nerve damage from the explosion and the ringing in his

19   ears may come and go.

20        There is another detective, DR.  DR lost hearing

21   during the initial blast.  Some of DR's hearing has not

22   returned and he has been experiencing migraine headaches.  A

23   week after the incident, DR was seen by a doctor who stated

24   DR's eardrum had been damaged.  DR has had three or four

25   follow-up visits to his doctor.  The ringing in his ears has

1    subsided, but DR is still having headaches.  This was a

2    January 2021 interview, six months after the events.

3         There's an Officer EH, who was interviewed in

4    January 2021.  EH stated she has -- had temporary blindness

5    and hearing loss from the explosion.  EH experienced pain in

6    her ears for two to three months after the incident.

7         So those are the victims who at least have -- had

8    serious injuries beyond just the temporary blindness that most

9    of them suffered when this explosion occurred and, of course,

10   they did given the -- anybody viewing the video would see the

11   large amount of flash that came from it.

12        So in aggravation, we have the serious injuries to

13   multiple police officers, one which is permanent -- permanent.

14   Over $13,000 in medical bills for the officers incurred.  It's

15   been a loss to Naperville itself.

16        You could've thrown it anywhere, as the government

17   said.  You threw it at the police.  Inexcusable.  If you

18   wanted to raise hell, throw it in an empty area, but you threw

19   it at the police.  You took an affirmative step of not just

20   picking it up.  I know you didn't bring it, and that is a

21   matter in mitigation, but you picked it up, and rather than

22   just throw it, you saw that there was a wick that had to be

23   lit and you asked someone for a lighter so that you could then

24   light it and throw it.  This was not a spontaneous, unthinking

25   event.  It happened quickly, but there was some thought that

1 went into it because you had to ask someone for a lighter to

2 light the thing and throw it.

3    You turned an already volatile situation into

4 something that descended into an uncontrolled situation of

5 looting and violence.  That's why I read the rest of that

6 police report to understand the -- so that you understand what

7 was going on.

8    And rather than, you know, once you throw the

9 explosive device and realizing, boy, I just made a big

10 mistake, you go off to a library and throw a brick through it,

11 brick through the window.  And I know you're not convicted of

12 that crime, but I read the police report.  You confessed to

13 it, so it's not a -- it's a fact that I can take into account

14 in aggravation.

15    Your cocaine use and lying about it while on pretrial

16 release, you know, people are addicted.  That happens.  And

17 sometimes people have demons relating to drug use they can't

18 control.  But you lied about it repeatedly to pretrial

19 services and to me, and I was more than patient.  Most judges

20 would've thrown you in jail right now and you'd be in jail.  I

21 was patient with you because I believed when you said you were

22 going to try and, you know, you weren't using it or you were

23 going to try and get some help and -- most defendants on

24 pretrial release don't go out and commit other crimes, and you

25 did by obviously purchasing cocaine and then using it.

1          In mitigation, you didn't go there with the purpose

2    of throwing an explosive device.  It was an impulsive act, but

3    it, nonetheless, required some thought, as I just said.  You

4    have no prior criminal record of any note; no prior criminal

5    record, as far as I'm concerned.  You have family support.

6    There's family here.  You have a job waiting for you no matter

7    what the result is here today.

8          I read the letters written by your family and by you,

9    and they were genuine, and it's obvious they see a side of you

10   that is different than the side that is presented to me here

11   relating to your crime.

12         You're an unsophisticated person.  I recognize that.

13   There's -- I won't go through all the details that's contained

14   in the presentence report, but you're -- I think one way of

15   putting it is your executive function skills are lacking,

16   meaning you don't think before you do things and that it makes

17   you more susceptible to peer pressure, managing emotions, and

18   controlling impulses.

19         But you're not mentally ill.  You're an adult.

20   There's no finding that you're -- you didn't understand the

21   consequences or the -- what could be the consequences of your

22   actions.  You did something stupid; didn't think.  And one of

23   the things -- I think when you were interviewed, your own

24   explanation for why you did this was you saw the firework had

25   fallen out of the side pocket of a backpack of someone else,

it fell on the ground, it was shaped like a little ball with a
little square at the bottom.  You grabbed it where you could
spark it and it would stick together like with tape.  And then
you said, "Oh, shit, it's a firework."  Then you said -- when
it got to him, you said, "Fuck it.  I'm going to spark it and
throw it."  You didn't have your own lighter so he borrowed
one from an unknown Hispanic male.  And you then lit it and
just threw it.  Asked why he threw it, Rea said, "It was
just -- it just, like, got to me.  It was just like, fuck it,
and just throw it that way."

        That's not an articulate or really a reasonable
explanation for why you should throw it.  Maybe it's
impulsive, maybe it's stupid.  Of course it's stupid, but it's
not a matter in mitigation.  So those are the facts in
aggravation and mitigation.

        You apologized to me.  Well, I don't have hearing
loss because I wasn't there when you threw it.  I appreciate
your apologizing to me, but the people who you ought to
apologize to are the people who are going to have to live with
the consequences of what you did for the rest of their life.

        MR. ROELLIG:  Judge, just so you're aware, he did
write a letter to the officers.

        THE COURT:  I saw it.

        MR. ROELLIG:  Okay.

        THE COURT:  Yeah.

1          MR. ROELLIG:  I just wanted to make sure.

2          THE COURT:  In his oral statement right now, he

3    apologized to me and the officers.  I acknowledge the officers

4    are the ones deserving of the apology.  I'm not.

5          Specific deterrence, you're unlikely to commit a

6    serious crime again.  This seemed pretty situational, and

7    hopefully, there won't be another incident like George Floyd's

8    death and not the belief that the way to honor and protest

9    someone's memory is to loot and destroy a downtown and destroy

10   a number of small businesses or a library.  Hopefully, that

11   doesn't happen again so you're never put in that situation

12   where you can make impulsive, stupid decisions.

13         General deterrence, it is important that the public

14   understand that if you harm police, people with families just

15   like yours who are simply doing their jobs to try and prevent

16   disorder, if you harm them, you're going to suffer the

17   consequences.  I don't particularly care that it was an

18   impulsive act where you didn't understand the consequences of

19   your actions.  If you throw an explosive device at the police,

20   you have to know you put them at risk even if you didn't

21   anticipate the damages you would cause.

22         As I said, one officer has permanent hearing damage;

23   has a hearing of a person in his 70s, and he's in his 30s or

24   40s.  That will affect his ability -- I don't know; it may

25   affect his ability to remain a police officer.  I don't know

1     that. But it does affect his everyday life. His ability to

2     hear his wife and children, if he has them; his ability to

3     hear music, birds, the wind. All the things you enjoy, all

4     the things all of us enjoy, he can't do it now, forever.

5         Everyone who wants to hijack a legitimate protest to

6     unthinkingly raise hell just because you can, think twice

7     because you will end up in jail. Protest is protected by the

8     First Amendment; violence is not. That's a crime.

9         And as I said, you're lucky. If one of these

10     officers was killed or even more seriously injured, not that

11     these weren't serious injuries, you'd be looking at a state

12     court attempt murder or manslaughter charge, and you'd be in

13     Stateville or Pontiac right now.

14         Three things tipped me over the edge as to what the

15     sentence should be here. One is the brick thrown through the

16     library window, which you admitted to in a police report, so

17     I'm taking it as an aggravating factor. It wasn't just one

18     impulsive act. You just joined right in with all the rest of

19     the rioters and criminals. The cocaine use and the lies to me

20     about it and, finally, the physical injuries, some of which

21     were permanent, caused to the police officers.

22         Are there any primary arguments in mitigation I

23     failed to address, Mr. Roellig?

24         MR. ROELLIG: No, Judge.

25         THE COURT: All right. Pursuant to the Sentencing

 1  Reform Act of 1984, it's the judgment of the Court the
 2  defendant, Christian Rea, is hereby committed to the custody
 3  of the Bureau of Prisons to be imprisoned for a term of
 4  12 months on Count 1.
 5      It's ordered the defendant pay restitution in the
 6  amount of $13,585.66.  Payment shall be directed to the
 7  victims as provided in the judgment order to follow.  I waive
 8  the fine, as I already said.
 9      And upon release from imprisonment, the defendant
10  shall be placed on supervised release for a term of three
11  years.  The first six -- and within 72 hours of release from
12  the custody of Bureau of Prisons, the defendant shall report
13  in person to the probation office in the district to which the
14  defendant is released.  While on supervised release, the
15  defendant shall comply with the mandatory, discretionary, and
16  special conditions delineated in part D of the presentence
17  investigation.
18      I need to inform you, you have a right to appeal your
19  conviction if you believe your guilty plea was somehow
20  unlawful or involuntary, or if there is some other fundamental
21  defect in the proceedings that was not waived by your guilty
22  plea.
23      You also have a statutory right to appeal your
24  sentence under certain circumstances, particularly if you
25  think the sentence was contrary to law.

1          Any notice of appeal must be filed within 14 days of

2     the entry of judgment or within 14 days of the filing of a

3     notice of appeal by the government.  If requested, the clerk

4     will prepare and file a notice of appeal on your behalf.  If

5     you cannot afford to pay the cost of an appeal or for

6     appellate counsel, you have the right to apply for leave to

7     appeal *in forma pauperis*, which means you can apply to have

8     the court waive the filing fee.  On appeal, you must also

9     apply for court-appointed counsel.

10          Anything else from the government?

11          MR. JONAS:  No, Judge.

12          THE COURT:  Anything else from probation?

13          PROBATION OFFICER:  Surrender date, Your Honor.

14          THE COURT:  We'll -- Mr. Roellig, when can your

15     client surrender, and also, is there any recommendation as to

16     the place of incarceration?

17          MR. ROELLIG:  On the surrender, Judge, we're up

18     June 9th in DuPage.  I expect now that Your Honor's entered

19     your sentence, we'll -- we'll get some resolution there, so I

20     would like it to be -- to be on -- to be beyond that date

21     that's not very far from here.  So I'm guessing, given the way

22     it works in DuPage, they're going to be requesting a -- if we

23     do a 402, they're going to be asking for a PSR, and then we

24     are going to have to do a PSR and then come back and do the

25     plea.  If Your Honor would be so inclined, we could set it out

1    for 60 days on the surrender date, and then he could wrap up

2    DuPage.

3              THE COURT:  Ms. Stern, how long does it take to get a

4    designation?

5              PROBATION OFFICER:  Six to eight weeks, Your Honor.

6              THE COURT:  All right.  Let's make surrender in

7    12 weeks.  Then that'll allow your client, if he wants to, to

8    self-surrender to the institution he's been designated.

9    Otherwise, he's got to report here to the federal building and

10   he's going to have to ride a bus to the jail.  It's much

11   preferable for most defendants -- and I assume yours

12   included -- to self-surrender.

13             So, Emily, 12 weeks is when?

14             MR. ROELLIG:  And also, Judge, as far as the

15   designation goes, we'd just ask as close to Chicago --

16             THE COURT:  Sure.

17             MR. ROELLIG:  -- as possible.

18             THE CLERK:  It looks like 12 weeks out would be

19   August 16th.

20             THE COURT:  All right.  Is that a Monday?

21             THE CLERK:  It's a Tuesday.

22             THE COURT:  Tuesday.  All right.  August 16th by noon

23   to the penitentiary he is designated to.  He can

24   self-surrender.  If he chooses not to self-surrender, he needs

25   to report to the U.S. Marshals Service on the 24th floor of

1  this building.

2          Has your client been vaccinated?

3          MR. ROELLIG:  Yes, Judge.

4          Both -- both vaccinations.  Right?

5          THE DEFENDANT:  Yes.

6          MR. ROELLIG:  Yes, Judge.  Not fully boosted but

7  vaccinated.

8          THE COURT:  I would strongly recommend if he's

9  eligible for a booster to get it.  Jail is no place to be if

10 you're not fully protected.  I can't require it, but I can

11 recommend it, and I do recommend it for his own safety.

12         All right.  I would have given him, candidly, a much

13 higher sentence but for the fact of his age, but more

14 importantly, some of the information, which I won't go into

15 the record on, that was contained in the presentence report

16 relating to the Northwestern evaluation of him and his mental

17 condition.  But for that, I would have gone above the

18 guidelines because this case cries out for it, but I'm -- I

19 considered that in deciding this was the sentence.

20         All right.  Anything else by anyone?

21         MR. JONAS:  Judge, just to be clear, the conditions

22 of pretrial release will continue up to the date of surrender.

23 So the defendant understands, he's -- I think it's home

24 confinement is what he's currently --

25         THE COURT:  Yeah.  There's no change in the

1   conditions of -- I'll wait until Mr. Roellig's back.

2       (Counsel and defendant conferring.)

3           THE COURT:  There's no change in the conditions of

4   pretrial release.  They remain until the date he surrenders.

5           MR. ROELLIG:  That's fine, Judge.  I was just

6   checking on the restitution again.  I want to make sure that

7   he can pay it in installments when he gets out.  Not due now

8   because the family just can't pay it.

9           THE COURT:  Yeah, no installments are called for in

10  the -- in the conditions of supervised release, so they --

11  that will take place over time.  There may end up being a

12  restitution order because I think there was a fairly large

13  amount of money spent to repair the window at the Naperville

14  library.  But that's up to a DuPage judge, not me.

15          All right.  That's it for the government?

16          MR. JONAS:  Yes.  Just one for the record.  I did

17  circulate to the Detective AC that's been my point of contact

18  the apology letter that the defendant wrote 'cause -- just in

19  response to Your Honor's comment about he should apologize to

20  those who were injured.

21          THE COURT:  Okay.  Thank you.  My sentence is

22  unchanged and -- despite knowing of that -- I knew he had

23  apologized by letter to the officers, but I have considered

24  that also.

25          Anything else from defense?

1      MR. ROELLIG:  No, Judge.

2      THE COURT:  Anything else from probation?

3      PROBATION OFFICER:  No, Your Honor.  Thank you.

4      THE COURT:  All right.  Thank you all.

5      MR. JONAS:  Thank you, Judge.

6   (Proceedings concluded at 11:07 a.m.)

7                     CERTIFICATE

8    I certify that the foregoing is a correct transcript from

9   the record of proceedings in the above-entitled matter.

10  */s/ Elia E. Carrión*          *2nd day of May, 2024*

11  *Elia E. Carrión*                      *Date*
    *Official Court Reporter*

12

13

14

15

16

17

18

19

20

21

22

23

24

25